UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:26-cr-7 |
| | ) | |
| ISAAC JAMES GUINSLER, | ) | |
| | ) | |
| Defendant. | ) | |

**MR. GUINSLER'S POSITION WITH RESPECT TO SENTENCING FACTORS**

Isaac James Guinsler will appear before this Court for sentencing as a young man of 25, for conduct he committed when he was 23. He faces at least a decade in prison and an advisory guidelines range of 30 years to life imprisonment. Because the guidelines range is overly punitive given Mr. Guinsler's circumstances and advises a term of incarceration that is substantially greater than necessary in this case, the defense requests a substantial downward variance. The Court should sentence Mr. Guinsler to 12 years' incarceration followed by an appropriate term of supervised release.

Mr. Guinsler has read the presentence report prepared by the probation office and has no objections to the report.

**The Appropriate Sentence**

This Court must sentence Isaac to the least amount of incarceration necessary to accomplish the purposes of sentencing as stated in 18 U.S.C. § 3553(a). This requirement is not just another factor to be considered along with the others but instead sets an independent limit on the sentence. Additionally, a sentencing court must "tak[e] into account the real conduct and circumstances involved in sentencing" as well as the defendant's personal history and characteristics. *Gall v. United States*, 552 U.S. 38, 54 (2007). The Court must "consider every

1

convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52.

The requested sentence of 144 months (12 years) is sufficient but not greater than necessary given Isaac's sincere acceptance of responsibility, post-offense transformation, fractured upbringing, and young age. Additionally, as explained below, the advisory guidelines range is far too harsh and should not act as an anchor in the Court's assessment of the appropriate sentence.[1]

## I.       Isaac's history and characteristics

Twenty-five-year-old Isaac Guinsler (pronounced ginn-sler) was born in 2001 in Yorktown, Virginia. His basic needs were provided for as a child, but his upbringing was far from perfect, and a fraught family dynamic has contributed to how Isaac views the world, views himself, and interacts with others.

Isaac's parents, Bryon Guinsler and Anna Fleishauer, married in 1999. In addition to Isaac, the couple had two other children: older sister Emylee and younger sister Kaylee, both of whom are affiliated with the U.S. military, like Isaac was. Isaac also has two younger maternal half siblings. He maintains close ties with all his siblings and cherishes them; he is deeply remorseful the pain his conduct has caused his family.

When Isaac was only four years old, his parents separated. By the time he was six, they were divorced. While Isaac does not remember much from this period, his mother recalls that part

---

[1] The Sentencing Guidelines are advisory and are only one aspect of the required analysis. *United States v. Booker*, 543 U.S. 220, 260–61 (2005). Since *Booker*, the Supreme Court has consistently and significantly broadened the range of choices in sentencing dictated by the facts of the case. *See Gall*, 552 U.S. at 59; *see also Kimbrough v. United States*, 552 U.S. 85 (2007). As a result, "[a] district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring). A sentencing court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

of the reason the marriage dissolved was physical abuse Isaac experienced at the hands of his father. In particular, she recalls an incident in which his father picked Isaac up and threw him, which led her to remove his father from the family's home. She also has informed Isaac that he experienced sexual abuse at the hands of a family member during his toddler years, though Isaac fortunately does not remember it. Today, Isaac maintains daily contact with his mother but has no contact with his father.

That was not always the case. Isaac's father remarried shortly after the divorce. At the time, Isaac primarily lived with his mother. But when he was 11 or 12, his father and stepmother initiated court proceedings that led to Issac spending weekends at his father's home, then staying with his father and only visiting his mother every other weekend. In her letter of support for Isaac, his mother describes this period as one of "ongoing conflict" that "created instability during critical years of his development." Exh. 1, at 2 (combined letters). She further described some of the emotionally charged court proceedings in her conversation with the probation officer, PSR ¶ 68, including a time when the father and stepmother falsely claimed she was unfit to care for the children based on her prescription medication. Eventually, Isaac's mother made the hard decision to end contact to spare the children from the ongoing disputes.

Isaac initially had a cordial relationship with his stepmother. Over time, however, he came to feel that he would never be good enough in her eyes. She frequently nitpicked and criticized him. Worse, she made him feel "unworthy of having a relationship with God," although he has since overcome that feeling. PSR ¶ 62. When Isaac became interested in reconnecting with his mother, his stepmother did not take it well. While Isaac was generally permitted to visit friends, whenever he wanted to visit his mother, there were numerous restrictions. PSR ¶ 63. When Isaac was 17, an altercation between his sister and their stepmother was the final straw and led to them

moving back into their mother's home. In 2021, Isaac's father presented an ultimatum: if Isaac didn't want a relationship with his stepmother, then he wouldn't have a relationship with his father either. Isaac did not give in, and he has ended his relationship with his father for now. PSR ¶ 80.

Isaac overcame the instability and strife within his family and was on his way to a fulfilling career in the U.S. Army before his misconduct that led to this prosecution. After he graduated high school, he worked as a shipbuilder in Newport News for two years before enlisting to serve his country. That decision came with challenges; Isaac has struggled with depression and anxiety, some related to his separation from his family, and he has benefited from treatment. At the time of his arrest, he was an E-4 specialist and had received Good Conduct Medals during his service. He spent time in Texas and South Korea, and he completed college-level mathematics courses during his service. While he has lost that career and is in the process of separating from the Army, Isaac has not given up and remains focused on the future. He hopes to pursue training as an electrician and cook while in custody, and to study religious history to help deepen and enrich his faith.

Isaac's mother remains his strongest supporter. Her support is notable because, as she expresses in her letter, it is neither blind nor unconditional. When she learned about the allegations in this case, she had to balance her love for Isaac with her "responsibility to protect [the] family," which led her to set boundaries until she "could truly understand where he stood." Exh. 1, at 2. Since then, she has witnessed Isaac's sincere remorse and acceptance of responsibility through his actions and is now firmly in his corner.

Indeed, Isaac's post-offense behavior provides a remarkable demonstration of his rehabilitation and capacity for self-reflection and growth. When he was first contacted by Army CID in December 2024 related to a military search warrant, he began attending counseling with Celebrate Recovery, a faith-based, 12-step program, on his own initiative. PSR ¶ 79; *see* Exh. 1,

at 2–3; *id.* at 8 (letter from pastor praising "intentional steps to redirect [Isaac's] life even before his incarceration"). He consistently participated until his arrest. Related to his counseling, he also surrounded himself with mentors who hold him accountable and deepened his religious faith. Since entering jail, he has remained in contact with his "sponsor" from Celebrate Recovery for support and counseling. Isaac's initiative on this front is laudable and reflects his character and the sincerity of his remorse and acceptance. *See also* Exh. 1, at 5 (describing Isaac as a "peacemaker" who sought out counseling to try to repair his family relationships). While Isaac's faith may once have been an excuse to socialize or something he was required to do, *see* PSR ¶ 62, he has now fully committed his life to his faith and finds solace and purpose in his beliefs.

Finally, it bears emphasis that this is Isaac's first encounter with the law. He has no criminal history. He has never even been arrested before.

## II.    Isaac's youth

This Court knows that youth is mitigating. Recently, the Sentencing Commission acknowledged that truth, which science has long shown and courts have long understood. *See* U.S.S.G. § 5H1.1. The amended guideline, now located in Appendix B, read:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation. The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

U.S.S.G. § 5H1.1.

This policy statement, which remains a basis on which courts may reduce sentences for youthful offenders, is supported by empirical evidence and based in science. The underlying rationale has long been blessed by the Supreme Court. *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460, 471 (2012) ("[C]hildren have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking."); *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982) ("[Youth] is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors . . . generally are less mature and responsible than adults."); *Jones v. Mississippi*, 593 U.S. 98, 105 (2021) (observing that "youth matters in sentencing").

The Commission's published reasoning behind the Amendment reflects society's "advancement in knowledge of human behavior as it relates to the criminal justice process," and "evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability." U.S.S.G. Appendix C, Amendment 829 (internal citations removed). Further, the Commission accepted testimony that "certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime." *Id.*

Isaac is a young adult whose brain was (and is) still developing, and his conduct was unquestionably related to his age and immaturity. With enticement and child exploitation offenses in particular, a person's youth may cause them to misjudge the consequences of sending a message or clicking a link. It may also lead them to incorrectly view communications with minors as less problematic because they were only recently minors themselves. Fortunately, Isaac has demonstrated the potential to outgrow his youthful misconduct.  His letter speaks to that. *See* Exh.

2 (letter from Mr. Guinsler). This Court should give Isaac that opportunity by varying well below the guidelines.

### III.    The nature and circumstances of the offense

Isaac will appear before this Court for sentencing having pled guilty to one count of coercion and enticement of a child, in violation of 18 U.S.C. § 2422(b). PSR ¶¶ 1–2. He understands and acknowledges the seriousness of his conduct, which is set forth in the statement of facts he agreed to and in the PSR, ¶¶ 12–20. Mr. Guinsler exchanged sexual messages with two minors in other states using social media applications, and they sent him explicit media of themselves. Investigation uncovered additional CSAM on Mr. Guinsler's devices.

Again, there is no question this conduct is serious. But so is a decade in prison. While the government will certainly focus on what Mr. Guinsler did, it is just as important to remember what he did not do. Isaac did not have any hands-on contact with the minor victims, or with any other minors. He did not attempt to meet with the minors in person, and there is no evidence of any plans to do so. This is true even though he had the financial means and ability to travel to attempt meetings; this is not a case where law enforcement foiled or catfished a planned sexual encounter. And there is no evidence that he distributed the images of the victims to anyone else, despite that being as simple as clicking a few buttons. In short, Isaac's conduct is consistent with someone seeking connection in a profoundly misguided way and acting on youthful impulses, not a mature adult seeking hands-on relationships. All these factors help situate this case on the spectrum of cases that involve the same criminal offense and guidelines ranges, and they set it apart from other cases that involved more serious conduct and required more serious sentences.

Mr. Guinsler has been cooperative with all aspects of the investigation and admitted to his actions.

## IV.    The production guideline, § 2G2.1, is deeply flawed and deserves little deference

Isaac's sky-high offense level is mostly due to a cross-reference to U.S.S.G. § 2G2.1, the guideline for production offenses. *See* PSR ¶¶ 37–44. But that offense level is not the product of the neutral and empirical approach.

Congress has tasked the Sentencing Commission with "writ[ing] Guidelines that will carry out th[e] . . . objectives" in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). That statute seeks to ground sentencing decisions in consideration of, among other things, "offense and offender characteristics"; "the need for a sentence to reflect the basic aims of sentencing, namely, (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation"; and "the need to avoid unwarranted disparities." *Id.* at 347–48. And the "Commission, in describing its Guidelines-writing efforts, refers to these same" § 3553(a) considerations. *Id.* at 348.

Typically, the Commission bases "its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). And its work is "ongoing," with the guidelines undergoing a "continuous evolution" based on sentencing data and advice from informed stakeholders about whether the Guidelines are serving the "§ 3553(a) objectives." *Rita*, 551 U.S. at 448 U.S. at 348–50. It is because of this ongoing, empirical, consensus-driven process that, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109. But in certain cases, the Commission has departed from its usual process and instead constructed guidelines around statutory directives from Congress. *See id.* at 96–100, 109 (discussing crack-powder cocaine disparity). The Supreme Court has recognized that because guidelines of this type "do not exemplify the Commission's exercise of its characteristic institutional role," they are less likely to

8

further "the purposes of sentencing set forth in § 3553(a)." *Id.* at 109–10. And as a result, a district court need not afford those guidelines as much weight or as much deference as it would guidelines that result from the Commission's normal data-driven procedures. *Id.*

The Court should view U.S.S.G. § 2G2.1, which applies to production of child pornography offenses, with skepticism because it does not exemplify the Commission's exercise of its characteristic institutional role. Courts have recognized that it "presents some of the same problems presented by § 2G2.2[,]" the much-maligned non-production guideline. *United States v. Price*, No. 09-CR-30107, 2012 WL 966971, at *11 (C.D. Ill. Mar. 21, 2012).

When the Commission promulgated the original Guidelines, it placed production offenses in § 2G2.1, which called for a base offense level of 25. U.S. Sentencing Guidelines Manual U.S.S.G. § 2G2.1 (1987). The sole adjustment in § 2G2.1 was a two-level enhancement for cases in which the victim was under 12 years of age. *Id.* Effective November 1, 1990, the Commission increased that enhancement to four levels and added a two-level enhancement for cases in which the victim was between 12 and 16 years old. U.S.S.G. App. C., amend. 324 (Nov. 1, 1990). It also promulgated a new two-level enhancement that applies if "the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant." *Id.* The Commission gave no explanation for either change. *See id.*

In 1995, Congress passed SCAPA, which directed the Commission to amend the Guidelines to increase the § 2G2.1 base offense level "by at least 2 levels." Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104–71, § 2(1), 109 Stat. 774 (1995). The statute also ordered the Commission to "amend the sentencing guidelines to increase the base offense level by at least 2 levels [under § 2G2.1] if a computer was used to transmit the notice or

9

advertisement." *Id.* § 3. The Commission responded by (1) raising § 2G2.1's base offense level from 25 to 27, the minimum increase permitted by SCAPA, and (2) adding a two-level enhancement (also the minimum increase permitted under the statute) applicable if "a computer was used to solicit participation by or with a minor in sexually explicit conduct for the purpose of producing sexually explicit material." U.S.S.G. App. C., amend. 538 (Nov. 1, 1996).

The Protect Act, enacted in 2003, increased the mandatory minimum sentence for production offenses from 10 years to 15. Protect Act, Pub. L. No. 108–21, § 103, 117 Stat. 650 (2003). In response, the Commission increased the § 2G2.1 base offense level from 27 to 32. U.S.S.G. App. C., amend. 664 (Nov. 1, 2004). At the same time, the Commission added three new adjustments: (1) a two- to four-level enhancement if the offense involved a sexual act or sexual contact, (2) a two-level enhancement if the offense involved distribution, and (3) a four-level enhancement if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence. *Id.*

So, the Commission initially set the § 2G2.1 base offense level at 25 and subsequently raised it to 32 only because SCAPA mandated a two-level increase and the Protect Act added five years to the mandatory minimum sentence. This seven-level boost represents roughly an additional five to seven years' imprisonment for a defendant in criminal history category I. Like the crack cocaine guideline, therefore, § 2G2.1's development was driven in large part by congressional directives and "mandatory minimum sentences," rather than "empirical data and national experience." *Kimbrough*, 552 U.S. at 109; *Price*, 2012 WL 966971, at *11 ("Section 2G2.1 is similarly not the product of empirical study by the Sentencing Commission."); *United States v. Krueger*, No. 09-CR-103, 2009 WL 4164122, at *3 (E.D. Wis. Nov. 23, 2009) (same); *United*

*States v. Jacob*, 631 F. Supp. 2d 1099, 1114 (N.D. Iowa 2009) (same); *United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (per curiam) (same).[2]

And, like the possession guideline, § 2G2.1 contains a number of enhancements that apply "in nearly every case":[3]

> a two- or four-level enhancement in § 2G2.1(b)(1) based on the age of the minor involved; a two-level enhancement in § 2G2.1(b)(3) if the offense involved distribution; a four-level enhancement in § 2G2.1(b)(4) if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence . . . ; and the two-level increase in § 2G2.1(b)(6)(B) for use of a computer or an interactive computer service to entice the minor.

*Jacob*, 631 F. Supp. 2d at 1114. Mr. Guinsler is assessed several of these, to no one's surprise. Even the Commission recognized, when writing amendments responsive to the Protect Act, that several § 2G2.1 enhancements were "expected to apply in almost all production cases (e.g., age of the victim)." U.S.S.G. App. C., amend. 664, Reason for Amendment (Nov. 1, 2004); *see also Price*, 2012 WL 966971, at *11 (noting several § 2G2.1 enhancements apply "in nearly every

---

[2] *See also United States v. Muzio*, 966 F.3d 61, 71 n.4 (2d Cir. 2020) (Underhill, J., dissenting) ("In my view, although perhaps not as egregiously, section 2G2.1 suffers from some of the same deficiencies as section 2G2.2 because, rather than being a product of the Commission's empirical study, Congress has driven amendments to that guideline."); *United States v. Brown*, 843 F.3d 74, (2d Cir. 2016) (Pooler, J., dissenting) ("As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'") (quoting United States Sentencing Commission, Federal Child Pornography Offenses 249 (2012); *United States v. Zauner*, 688 F.3d 426, 431 (8th Cir. 2012) (Bright, J., concurring) (citing Price with approval in § 2G2.1 case); *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014) ("Defendant may be correct when he says the child pornography production guideline, § 2G2.1, suffers from the same apparent defect as the distribution guideline, § 2G2.2.").

[3] Indeed, the Commission's 2021 report on production offenses noted that 90.8% of production offenders in FY 2019 received an enhancement for the age of the victim, and 71.7% received an enhancement for a sexual act or sexual contact, and 60.3% maintained a position of trust over the minor (though fewer received an enhancement based on that position). U.S. Sent. Comm'n, *Federal Sentencing of Child Pornography: Production Offenses* (Oct. 13, 2021), https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-production-offenses, at 26, 36.

11

production case, including, for example, an adjustment of 2 or 4 depending on the age of the minor involved and an adjustment of 2 for an offense involving distribution"); *Krueger*, 2009 WL 4164122, at *3 ("§ 2G2.1 contains some of the same specific enhancements as § 2G2.2, which can skew sentences upward. Both guidelines contain significant enhancements for factors, such as images of pre-pubescent minors, present in most cases.").

The result is that the frequently applied enhancements "skew offense levels upward such that [§ 2G2.1] does not appropriately distinguish between the least culpable and most culpable offenders." *Price*, 2012 WL 966971, at *11; *see also Jacob*, 631 F. Supp. 2d at 1114 (concluding § 2G2.1 "recommend[s] enhancements that d[o] not distinguish between least and worst offenders"); *Muzio*, 966 F.3d at 71 n.4 (Underhill, J., dissenting) ("[S]ome enhancements are applicable in so many cases that [§ 2G2.1] does not help distinguish between levels of culpability among defendants."). As with § 2G2.2, § 2G2.1's failure to differentiate degrees of culpability is "fundamentally incompatible with § 3553(a)." *See United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010). Because "Congress has significantly interfered with [the Commission's] efforts in this area," *Krueger*, 2009 WL 4164122, at *3, and because § 2G2.1 is a "blunt tool" that lumps unlike defendants together, *Muzio*, 966 F.3d at 71 (Underhill, J., dissenting), the Court should afford that guideline less deference than the Guidelines typically receive.

V.    **The pattern enhancement wrongly treats Mr. Guinsler as a dangerous recidivist for one course of uninterrupted conduct**

Section 2G2.1 is not the only flawed guideline section that is being applied to Mr. Guinsler. Section 4B1.5 is also flawed in its application here.

According to its commentary, § 4B1.5 is meant to enhance the sentences of defendants who "present a continuing danger to the public." § 4B1.5 cmt. background. Or, as the Commission put it when promulgating § 4B1.5, the adjustment is "inten[ded] to punish repeat child sex

12

offenders severely." U.S.S.G. App. C., amend. 615, Reason for Amendment (Nov. 1, 2001); *see also United States v. Bastian*, 650 F. Supp. 2d 849, 870 (N.D. Iowa 2009) ("In contrast [to § 2G2.2(b)(5), § 4B1.5 was created to address recidivism concerns."); *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) ("[§ 4B1.5(b)] is aimed at repeat and dangerous sex offenders and is intended to aggressively target recidivist exploiters of minors.").

Yet, the guideline's commentary instructs that an occasion of "prohibited sexual conduct" can be considered for § 4B1.5(b) purposes "without regard to whether the occasion . . . resulted in a conviction for the conduct that occurred on that occasion." U.S.S.G. § 4B1.5 cmt. n.4(B)(ii). That is, § 4B1.5(b) treats a defendant as a recidivist or "repeat child sex offender[]" even if prior instances of sexual conduct were never discovered and did not result in criminal charges.[4] *See* U.S.S.G. App'x C., amend. 615, Reason for Amendment (Nov. 1, 2001) ("[§ 4B1.5(b)] does not rely on prior convictions to increase the penalty for those who have a pattern of activity of sexual abuse or exploitation of a minor.").

Applying a recidivist enhancement so broadly is inconsistent with the general theory of recidivist sentencing enhancements:  that someone who has reoffended even after being punished for a prior offense must be incapacitated or subjected to more substantial specific deterrence, since prior punishments were evidently insufficient to change behavior. This theory is reflected in virtually every other recidivist sentencing enhancement in federal law. For instance, the career offender guideline, the Commission's primary tool for punishing recidivists more harshly, requires that "the defendant ha[ve] *at least two prior felony convictions* of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a) (emphasis added). The logic is perhaps most

---

[4] According to the Commission's 2021 report on production offenses, 51.6% of § 2G2.1 offenders received the § 4B1.5(b) recidivist enhancement in FY 2019 even though 70.3% qualified for the lowest criminal history category. *Production Offenses*, *supra*, at 24–25.

13

evident in the federal "three-strikes law," which require that each predicate offense for the enhanced penalty must have been "committed after the defendant's conviction of the preceding" predicate. 18 U.S.C. § 3559(c)(1). It is a defendant's *failure to desist* from criminal activity following conviction—not his failure to desist on his own, without ever being discovered—that is probative of whether he is likely to reoffend once released from prison on his instant conviction. Because § 4B1.5(b) ignores this commonsense insight, the Court should vary downward from it.

Here, Mr. Guinsler's guidelines are increased by five levels—effectively, an increase from 210-262 (Offense Level 37) to 360-life (Offense Level 42)—due to the pattern enhancement. That's more than a decade on the low end and a potential lifetime on the high end, which only reinforces the impropriety of this enhancement relative to Isaac's circumstances and his conduct. It is inappropriate to label Isaac and punish him as a repeat and dangerous sex offender for a course of uninterrupted conduct, particularly when Isaac took such remarkable steps to pursue rehabilitation on his own after he learned of the investigation.

## VI.    Punishment, deterrence, respect for the law, and protecting the public

A sentence of 12 years is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. To start, the requested sentence is no slap on the wrist. Isaac struggled when he was separated from his family after he enlisted in the Army, and separation due to a substantial period of imprisonment will be much more difficult for him. It is real punishment that is tailored to the seriousness of his conduct, and the requested term sends a clear message that similar misconduct will not be caught and not tolerated. It is further joined by lifetime branding as a felon and a sex offender, labels that will severely limit Mr. Guinsler's freedom and opportunities down the road. *See Smith v. Doe*, 538 U.S. 84, 115 (2003) (Ginsburg, J., dissenting) (describing the "profound humiliation and

community-wide ostracism" that attends sex offender community notification); Wayne A. Logan, *Informal Collateral Consequences*, 88 WASHINGTON L. REV. 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

Twelve years' imprisonment is also more than enough time to allow Mr. Guinsler to fully rehabilitate. He will exit prison another decade-plus older and more mature, further along the age-crime curve and with less of a likelihood to recidivate. During that period, he will participate in mental-health and sex-offender treatment, though the best treatment will be provided while he is on supervised release; the longer he is in custody, the longer he will be without the most effective treatment and counseling. For Isaac, that may be faith-based treatment. In any event, Mr. Guinsler has benefited from counseling and treatment in the past, and there is no reason to doubt he will continue to do so.

Even today, it is clear that Mr. Guinsler has been specifically deterred. Again, he sought out counseling and guidance of his own initiative, rather than waiting to see how the cards would fall. He recognized that he was on a dark path and needed an intervention. His sincere remorse and regret over his conduct, coupled with his demonstrated desire to be rehabilitated, won over his mother who initially sought reassurance about his heart given the allegations. It also bears emphasis here that Mr. Guinsler has never been to prison. "Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Qualls,* 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005).

Upon his release from incarceration, Mr. Guinsler will be subject to supervised release conditions and must register as a sex offender. Given that he will be subject to a rigid set of rules, Mr. Guinsler is unlikely to pose a future threat to anyone. Additionally, once Isaac was put on

15

notice that he was under investigation and that this prosecution was a possibility, he did not flee or disappear. He chose to face his mistakes and their consequences, displaying real acceptance of responsibility—something he has consistently expressed since his plea. This shows that he respects the law.

Given Mr. Guinsler's lack of criminal history, military service, and demonstrated remorse and acceptance of responsibility, there is a reduced need to protect the public from future crimes, especially if he participates in sex offender treatment, substance abuse treatment, and receives mental health care. In short, there is no reason to impose a more substantial period of incarceration, and such a sentence would be greater than necessary.

## VII.    Avoiding unwarranted sentencing disparities

This Court also must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A sentence of 12 years, below the advisory guidelines range, would not create any unwarranted disparities and would be consistent with what courts in this district have imposed in comparable cases. Indeed, according to the Sentencing Commission's Judiciary Sentencing INformation tool (JSIN), over the last five fiscal years (FY2021-2025), nearly all persons with the same (absurd) final offense level and criminal history category as Mr. Guinsler who were sentenced pursuant to § 2G1.3 (79%) and § 2G2.1 (61%) received downward variances or departures.[5]

---

[5] Very few individuals have sentencing characteristics similar to Mr. Guinsler due to the charge he pled to, the nature of his conduct, and the application of the pattern enhancement; as a result, the average and median sentencing data for this group is skewed by unknown aggravating variables and therefore less informative than in other cases. The point is that the guidelines are too high, and that similar conduct in other cases has resulted in sentences in line with the defense's request.

In *United States v. Forbes*, this Court sentenced a defendant who travelled to have sex with a minor. No. 4:17-cr-117, ECF No. 29 (E.D. Va. July 18, 2018). The defendant, who was in the Navy, had started an online relationship with the victim, who was 11 and had said that she was 14. No. 4:17-cr-117, ECF No. 17. After interacting online, Mr. Forbes flew to Louisiana to meet with the minor. He picked her up and took her to a Super 8 Motel where the two drank alcohol together, and then they engaged in oral and vaginal sex. Following that encounter, he dropped the minor off outside of her middle school. Investigators later found CSAM in Mr. Forbes' possession. The Court sentenced Mr. Forbes to **84** months in prison. No. 4:17-cr-117, ECF No. 29. While Mr. Forbes did not entice the minor in this case to produce and share CSAM, he engaged in far more serious conduct by travelling to her and engaging in sexual conduct with her.

Just last week, in *United States v. Burnett*, this Court sentenced a person to **120** months for one count of enticement. No. 2:25-cr-110, ECF No. 38 (June 12, 2026). Mr. Burnett, like Mr. Guinsler, was a servicemember, and the investigation initiated by the military uncovered that he communicated online with multiple minors and solicited explicit media from them. No. 2:25-cr-110, ECF No. 29. In particular, the defendant admitted to soliciting minors to send him images over social media, and enticing a teenager over dozens of conversations to engage in sexual conduct and send sexual images and videos. *Id.* The defendant also possessed hundreds of CSAM images and thousands of CSAM videos. *Id.* Here, Mr. Guinsler's conduct is no more serious apart from the identification of a specific second victim; further, the attitude reflected in the statements made by Mr. Burnett before he was prosecuted are significantly more aggravating.

And in *United States v. William Tyson*, Mr. Tyson pled guilty to receipt of child pornography. No. 4:16-cr-58, ECF No. 25 (E.D. Va. Dec. 1, 2016). By his own admission, he had been viewing child pornography for approximately 15 years and used a peer-to-peer file-sharing

program on his computer. Mr. Tyson utilized the KIK application to find girls who were 13 or older. Like Mr. Guinsler, he never took any steps to meet the minors, but he asked them to send to him nude photographs or videos of their genitals, which they did. A forensic evaluation revealed that the images and videos were clearly of underage females and the actual amount of child pornography images was 2,439. Mr. Tyson was sentenced to **144** months of incarceration.

As with any crime, there is a continuum of culpability. Every violation of federal law is serious, but the aggravators and mitigators involved are what ultimately dictate the punishment. Here, Mr. Guinsler's misconduct situates him nearby the cases discussed above, much closer to the mandatory minimum than to the sky-high guidelines range.

## Conclusion

Mr. Guinsler respectfully requests a sentence of 12 years (144 months) plus an appropriate term of supervised release.

Respectfully submitted,

ISAAC JAMES GUINSLER

By:_____/s/_____
Keith Loren Kimball
Supervisory Ass't Federal Public Defender
Virginia State Bar No. 31046
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-0870
Telefax: (757) 457-0880
Email: keith_kimball@fd.org

Davina Seoparsan
Virginia State Bar No. 97221
Smith Law Firm, PLC
133 Kings Way, Suite 3000
Hampton, Virginia 23669
Telephone: (757) 723-1991

Telefax :  (757) 723-8023
Email: dseoparsan@smithlawfirmva.com


Counsel for Isaac James Guinsler